Judge Gibbons and may it please the court, I'd like to reserve four minutes for rebuttal. The National Labor Relations Board struck down the public sector labor laws of the Little to an instrumentality of the band's government, the Little River Casino Resort. Those laws regulate the tribe's relationship with its own employees and its operation of an arm of its own government on its own land for the purpose of raising revenues to fund its government and provide critical services to its own members. Both the laws and the activities are at the very core of tribal sovereignty. Both the laws and the activities they regulate have been authorized and indeed encouraged by Congress as important attributes of tribal sovereignty. Under long established principles of federal Indian law, a federal agency cannot abrogate a tribe's sovereignty unless Congress has clearly authorized it to. There is no such clear authorization in the National Labor Relations Act, far from it. The board's order striking down the band's laws must therefore be set aside. How would you criticize, what is it, the D.C. Circuit opinion in the same, looks like the same case? That was the San Manuel case and it was, I guess our essential position on the San Manuel decision is A, it's distinguishable and B, if it's not distinguishable, it's just wrong. It's distinguishable because the D.C. Circuit did not have before it, as you do and as the board did here, a tribal law, a full-fledged tribal law that regulates every conceivable aspect of public sector labor law and perhaps most relevant here, prohibits strikes in the public sector as many state public sector labor laws do, as indeed federal labor law is that under the NLA, tribal employees at the Little River Casino Resort have a federal right to strike. That means that they can, in effect, shut down this operation that funds the tribal government. That's the National Labor Relations law. That's the uniform national law that affects private employers, generally speaking. Well, that's precisely our point, Judge Merritt. It's a private sector labor law which exempts governments. That's the essential issue in this case. The NLRB treats this tribal government, this sovereign government, which is every bit as much a sovereign as a state or the United States, as a private sector entity. We know as a realistic matter that's not true. They're not states. The people who run the casino could just put the money in their pockets unless there is some kind of regulation of abuses, right? No, that's not true at all. The Indian Gaming Regulatory Act comprehensively regulates Indian gaming. One of the things it does is to make clear that this is absolutely critical to tribal self-determination, tribal self-government, tribal self-sufficiency, critical aspects of tribal sovereignty. The Indian Gaming Regulatory Act also specifically provides what Indian tribes can do with revenues from a resort. You know, there seems to be a growing body of case law that takes a different view from your view with respect to this sort of commercial activity that might fund tribe operations. And it also looks like there's a growing body of case law in the other circuits that doesn't find the absence of any specific mention of Indian tribes in the legislation fatal to the application of a law of general applicability. And I gather that we would have to overlook not only the San Manuel decision but also some of that other case law in the circuits that takes a look at OSHA and some other statutory scheme. Well, there is no case in any court, very much including San Manuel, that involves tribal gaming, which has this unique status under IGRA, which goes to the core of tribal sovereignty as a congressionally recognized matter. That's the first part of it. The second part of it, there is actually a tribal law in place here. Now, in the en banc decision of the Tenth Circuit in Pueblo of San Juan, there was a similar situation. Do you think the outcome depends on whether the tribe has adopted its own regulatory scheme in a particular area? I don't think it necessarily depends on it, but you've got that situation here and it's not necessary to decide that here. And all I'm saying is that we think we win under the framework that is most faithful to Supreme Court precedent, which is the one we've set out in our brief and that I adverted to earlier. But we also think we win under the board's own framework, which is more or less the framework that you just referred to that's been adopted, not necessarily in labor cases but in some other cases by some other circuits. Any kind of commercial activity that a tribe engages in could, at the end of the day, be said to support the operations of the tribe and its governance, couldn't it? I think that's true and I think a different kind of operation might lead to the same result. I don't think you need to agree with that proposition to rule for us here because Indian gaming is unique. It is uniquely... Because it's established by federal statute. Even if you agree that people can debate whether the operation of a store or a gas station on tribal land constitutes an exercise of tribal sovereignty sufficient to trigger the clear expression requirement, I just don't think there's any reasonable debate that Indian gaming satisfy that precisely because Congress has resolved that issue. In this context then, does it become irrelevant that the employees in question are for the most part not members of the tribe or that the casino is catering to a clientele that is mostly non-members of the tribe? Judge Gibbons, we think it's no more relevant than that. A state casino or a state lottery or utility or hospital or anything else employs people from across the border in another state, serves them as customers and patrons. The relevant question for purposes of the interpretive enterprise here is how it affects the sovereignty of the tribe, not how it affects its employees or its customers. Judge Posner made this point in the Great Lakes case where the applicability of the Fair Labor Standards Act was at issue and the Department of Labor said, well, if you tribal agency and Judge Posner said, well, that doesn't matter. We're concerned with the sovereignty of the tribe and it's the tribe's interests that are being harmed by application of the National Labor Relations Act. Was that a casino? It was not a casino. It was a tribal police force. Sorry, a Fish and Gaming Wardens, so it was a tribal law enforcement agency. The way you read this NLRB order, does it apply to the tribal members that are working at the casino as well as the non-tribal members? Absolutely. The board's position is that there is one workforce and it has collective rights. As I read the board's brief, it doesn't matter whether there's a single non-tribal employee or a single tribal employee. The NLRA applies. That's the board's position in this case. The board's position is a relatively new one. For more than 30 years, it took the same position that we take here, which is that a tribe is treated like a state for purposes of determining the reach of the National Labor Relations Act. I don't see why, if we decide this case in your favor, it looks like to me that we're going to be clearly in conflict with the D.C. Circuit in the Emmanuel case. They say, for example, first, operation of a casino is not a traditional attribute of self-government. Rather, the casino at issue here is virtually identical to scores of purely commercial casinos across the country. Now, that's true here, too. I mean, right? Well, the key distinction, it seems to us, between the D.C. Circuit's decision and our case, is that the unfair labor practice at issue there was sort of a garden-variety action by the casino, allegedly discriminating against one union in favor of another. Here, the alleged unfair labor practice is the enactment of a set of laws which governs the whole relationship between the Little River Casino Resort and its employees, among other things, most pertinently here, prohibiting strikes, as most public sector labor laws do. So it seems to us, to the extent that the D.C. Circuit was engaged in some sort of balancing approach, which I think is probably the most reasonable reading of its decision, it says, you know, this isn't really... Well, I mean, to me, the most reasonable reading is to what it said, that I just read you. Right. But the D.C. Circuit took into account the sovereign interest at stake, which it deemed rather minimal. There was no law there, as there is here. And it took into account the federal interference with those tribal interests, which, again, it speculated were rather minimal. But you didn't have, in that case, an NLRB order that has the effect of enabling public sector strikes to shut down the casino and, in effect, shut down the tribe's government, which seems to us a rather different situation. So that is a basis, we think, for distinguishing the decision. But I will tell you, if you don't think it's distinguishable, we think it's wrong. We ought to distinguish whether the National Labor Relations Act applies, depending on what the unfair labor practice in the particular case involves. And I don't see quite how that's a rational way to go about it. Well, actually, that is precisely the board's position in this case. Because, recall, the board adopts this framework from the Ninth Circuit, the so-called Coeur d'Alene framework. And there are a number of exceptions, the first of which is really just a version of our proposed framework, which is that if there is a particular exercise of tribal sovereignty, that triggers the clear expression requirement. And the board just has a narrower idea of what constitutes tribal sovereignty. So, in essence, they would say if it's a true governmental function with true, in quotation marks, the police force, the prosecutor's office, the Health and Human Services Agency, and so on, the NLRA would not apply to that. But for things like this, it wouldn't. So they're engaged in their own line-drawing exercise. Our basic submission is twofold. First, it doesn't make any sense. It's not consistent with Supreme Court precedent to draw any lines at all. But second, if you do want to draw lines, it seems to us, wherever that line is drawn, tribal gaming has to fall on the side of the line that triggers the clear expression requirement. And there's no dispute in this case that the National Labor Relations Act has no clear expression of congressional intent to cover tribes. Am I right that neither of you are asking us to apply the D.C. Circuit's analysis here? I believe that's correct. Ms. Vahl can speak for herself, obviously, but we obviously don't endorse the D.C. Circuit's approach. All right. We'll hear from Ms. Vahl, and you'll have your rebuttal time, Mr. Himmelfarb. That's probably a good idea. May it please the Court. My name is Kara Voll, and I represent the National Labor Relations Board in this matter. After determining that Indian tribes are statutory employers under the National Labor Relations Act, the Board adopted its San Manuel test. This test is designed to accommodate core Indian sovereignty, the government's treaty obligations, and the Congress's plenary authority over Indian affairs. In this particular case, the Board applied that test to determine that it should assert jurisdiction over a casino that operates as do other typical commercial non-tribal casinos that employs 85 percent non-member employees, caters primarily to non-member patrons. What difference does it make what percentage are Indian and non-Indian? If your order applies to the Indian tribe members as well. Well, I think the issue here is that, as the Board explained when it adopted its test, in order to accommodate Indian sovereignty in deciding whether to assert jurisdiction, considers the three Kirtland factors that my opposing counsel referred to and then also undertakes an additional discretionary balancing. And what the Board is looking at there is, on the one hand, the effects on core tribe of sovereignty, and on the other hand, the effects, because there's another important federal policy at stake here, and that's the protection of employees and effectuation of national labor law. And so, of course, issues like the number of employees who are non-members and the number of patrons and the advertising out of state, the typicality of the commercial operations and the fact that this casino competes with non-tribal casinos, all of those are factors, none of them by itself is positive. But the point is, all numbers are relative. So if you say, gee, there's not really that many tribal members employed here as a percentage of the whole, it's probably true. But in terms of the employer of Indian tribe members, this would be far and away the biggest employer of tribal members of that tribe, would it not? I'm not certain. What else do they do? Sorry? What else do they do? Well, I'm not familiar with all of their operations, but we know that, for example, within the government, the tribe employs... We have lots of tribes in Michigan. I can assure you they don't do anything else. There isn't anything else to do on the tribal reservation. That's the whole point of the Indian Gaming Act. Well, my understanding is that... What I'm trying to figure out, assuming that I'm right, and you can disagree with that, now if this Indian statute, whatever we call it, is set aside in favor of the NLRB order, then all of a sudden, all of the employees of the casino can go on strike, right? They would then have the ability to strike. Well, I mean, of course, any employee technically has the ability to strike. They would be able to collectively strike and be protected against unfair labor practices, right? They would be. So they can shut down the casino. Over half of the tribe's revenues then cease because of an economic action by a union, correct? Well, I think that the premise of that... Is that right or wrong? Is that technically possible, Your Honor? Yes, I think... How can that not affect the sovereignty of the tribe when that's the revenues that they rely upon for tribal member welfare? I don't get it. Well, Your Honor, I mean, I think there are a number of answers to that. As an initial matter, sovereignty in this context and in the case law is not really a very precise term of art. And so the fact that the Indian tribal government is affected does not mean that the core intramural self-government within the meaning of the Kirtland standard is impaired. And so, you know, I would like to focus again on the reason that the board asserted jurisdiction here is the commercial nature of this enterprise in part and also the non-tribal members. Just with respect to your other question, we do know that there are about 1,150 government employees, about 900 of them in the casino. So this is not a very developed record. It was a stipulated record. So we know that there are 250 other government employees that may be tribal members. We don't know. Only about 100 of the employees at the resort are tribal members, just to answer that question. But with respect to the casino potentially being subject to strike, you know, the National Labor Relations Act, as Judge Merritt, I believe, was referring to, applies to all sorts of large commercial enterprises. I'm sorry to interrupt you, but I was trying to figure out your wording there. Are you calling all – did you say government employees? The – Is that the phrase you just used? Yes, and I'm not – So all private members that work on the casino that don't belong to the tribe, they're now government employees. That's your whole viewpoint, isn't it? The tribe has titled them government employees. The board's position, as I think I made clear in my brief, is that with respect to classification for the National Labor Relations Act and for federal Indian laws, we can see in cases like Mashantucket, depends on a functional – and Frenchtown from this circuit for the National Labor Relations Act depends on a functional evaluation of what the employee does. So we're looking at whether their functions are governmental. The tribe and the record – seem to be terribly – I mean, you may be – I'm sure you're right. They are, in fact, tribe employees. I'm not sure it's real helpful to your position to refer to them as government employees because that sort of seems to lump them in with all the other – the employees of other governments who, in fact, are not governed by the NLRA. Thank you, Your Honor. I obviously didn't mean to imply any – Semantically, it seems like a bad choice and probably from an advocacy standpoint as well. Well, and I think this goes to our point, however, with respect to the law that the tribe claims that – the tribe claims that the fact that a law is – a tribal law is at issue would make our standard inapplicable, I think is the claim. And, again, that's a question of labeling because in that law the casino is, in fact, labeled a government enterprise and its employees are labeled government employees. And that's just a fact of the record and a fact of how the FEPC is written. However, again, the board examines and this court examines in similar contexts the functions of the employee and the functions of the agency or the enterprise. Do you disagree with the D.C. Circuit opinion? Do I disagree with it? Well, D.C. did not adopt the board's San Manuel standard and that remains the board's standard. However, D.C. – You mean this sort of multi-factored standard? Is that what you're referring to, that there are a lot of different factors involved? The D.C. Circuit didn't talk about a number of the factors. Is that why you disagree with it or maybe you don't disagree with it? I don't know. No, I mean the D.C. Circuit, I think in the end the D.C. Circuit test, as I believe the opinion discusses near the end of its opinion, considers essentially all of the same standards as the board's San Manuel and the many district courts' Coeur d'Alene standard. Wait a minute. They expressly declined to follow Tuscarora-Coeur d'Alene. The board position is Tuscarora, however you say it, Coeur d'Alene applies, right? Yes. So you like the end result of D.C. but you're not advocating their approach. I'm not advocating the District of Columbia Circuit's approach. I'm just pointing out that I think it is very consistent with the board and the other circuits' approach. As a matter of litigation strategy, when the board is in the situation in which you find yourself and the petitioner has sought to be in a circuit, you know, sought to be in the Sixth Circuit, where there is no governing circuit precedent, I guess the board always sticks to its own interpretation as opposed to adopting the analytical framework of one circuit or another that might have applicable law. Is that right? Because of the possibility that you will be in another circuit tomorrow. Is that right? Well, I think Your Honor is referring to the board's non-acquiescence position and the board does not acquiesce to another circuit. In this case, of course, the board deliberately followed and adopted the standard that has been used by the Ninth Circuit, the Seventh Circuit, the Second Circuit, and the Eleventh Circuit and which arguably some other circuits have considered in less analogous circumstances. You know, and even the Tenth Circuit with Pueblo has in some circumstances, which it terms proprietary enterprises, which I would argue the casino satisfies, does also use a similar Tuscarora-Kirtland type standard. So I think in this particular case, the board is actually consistent with the majority of the circuit courts that have considered the intersection. So in this case, it makes sense as a matter of general strategy for the board to take the position it's taken, right? I would argue that it does, Your Honor, yes. But again, I think that, you know, it is also consistent because my opposing counsel has suggested that this test, which as I mentioned, the majority of circuit courts who have considered this kind of general federal statute and its intersection with Indian law have used an element of this test, although of course the board's test has the additional discretionary standard that pauses once again. How many federal casino, Indian casino cases are there? Just the one or many? Well, there are a number of cases involving federal Indian casinos in terms of under the National Labor Relations Act, if you're referring to that, there's of course the San Manuel decision in the District of Columbia Circuit, and then there are now in litigation in the Courts of Appeals three. Three in litigation? Yeah. But not decided? But not decided by Courts of Appeals. And are they all similar cases or different, or how do they differ? The other two cases both apply the board's San Manuel test and the board asserts jurisdiction in both cases under that test. Those cases raise treaty issues that aren't present in this case where there's not a treaty exception asserted. So they're under the same standard, but they're focused maybe a little bit on a different factor. And do they all follow the D.C. Circuit opinion? Is that what you're saying? All of them. Oh, I'm sorry. Excuse me, I realized the confusion. When I say the San Manuel standard, I'm referring to the board's San Manuel standard, which is the board's modification and augmentation of the Kirtland standard broadly accepted among four or five Circuit Courts of Appeal, which is distinct, as Your Honor pointed out. The D.C. Circuit in San Manuel specifically declined to follow that standard. However, as I said, I think it not only considered many of the same factors relevant, if not all of the same factors, but I think a key thing that the District of Columbia opinion does, possibly even more than many of the opinions that apply, Kirtland is it. Are these other casino cases, Indian casino cases, have they been argued already? No, they have not been briefed yet. Isn't the answer, counsel, that none of them apply the D.C. approach? Oh, yes, and I did not mean to. They might come to the same end result for a different reason, but none of them follow D.C. No, when I say they follow D.C. We're really arguing here between the Ninth Circuit approach and the Tenth Circuit approach. That's the two sides carved out here, right? Well, I mean, first of all, I would say it's the Ninth, Second, Seventh, Eleventh Circuit approach adopted in some circumstances by the Eighth, Third, I think Federal Claims Court, and in certain circumstances by the Tenth Circuit. But, of course, yes, my opposing counsel is relying on the portion of Tenth Circuit precedent that relates to sovereign activities of a tribe. So it's a carve-out of one circuit's interpretation of the relevant law here. Just out of curiosity, it's probably an easy answer that I should know, but what is the national policy, if you know, that would apply, as you argue, this law of general applicability to Indian tribes as a form of sort of quasi-sovereign government, but not apply it to sovereign governments like states? Well, with respect, I can speak to the National Labor Relations Act, of course, Section 2.2 of the Act specifically exempts, it's an easy answer, specifically exempts state governments. I understand. I'm asking what's the national policy in doing so and applying it to one form of a governmental employee and not to another? Well, Congress made that choice with respect to states, so the Board didn't, you know, engage in a policy analysis. But what's the underlying policy reason to differentiate? Well, I think what the Board did here in considering Indian tribal governments is, and it went out of its way not only adopting the Kirtland Standard, but adding this thing. That's not what he's asking. I don't care what the Board thinks. I'm asking if you know or have an opinion, why would Congress differentiate between states and Indian tribes? Because that's what you're saying they did here implicitly, not expressly, in the National Labor Relations Act. Right. Well, and I think the quick answer is that we don't know why Congress did it, but that the Board is tasked with enforcing and effectuating and, you know, filling out national labor policy, and it didn't broadly apply the Act to Indian tribes. It distinguished between Indian tribes acting as governments, as sovereigns, like a state, and it does not apply the Act in those cases. But it found that when you have a multifaceted, sophisticated commercial enterprise like this one. But the Act doesn't apply to states engaging in a proprietary activity. That's the distinction you're trying to draw right now. But, again, that is simply, I don't know what the Board's position would be on that, but the Act simply precludes it. What the Board has said is the Board has recognized the policy of not applying to sovereign governments, but it has, for a government it can address, like an Indian tribe, it has made the distinction between a sovereign activity and a commercial activity like this one. And I see my time is up. Had you answered the question? I had answered that question, yes. Yes, okay. Thank you. All right, we'll hear from Mr. Himmelfarm. My friend, Ms. Vall, conceded that casino workers are government employees, and while she tried to backtrack from that, I just don't think there's any question that she was right the first time. Employees at the Little River Casino Resort are no less government employees than state employees. They are no less government employees than the employee of a tribal police force or prosecutor's office or tribal court. And the NLRB agrees that in those circumstances the NLRA does not apply. So they have to then go to this proprietary, non-proprietary activity test, right? I think that's the core of their position. And your argument is that it's distinguished from all these other circuits because the Indian Gaming Act treats casinos differently because they replace tax revenues as the economic base of all Indian tribes, or most Indian tribes. Absolutely right. Is that basically the bottom line here? Absolutely right. The casino is the functional equivalent of a taxing authority. Do we find that, is that a text-based argument with respect to the Gaming Act, or is that merely a, you know, is that kind of an underlying policy argument? I think the way the Indian Gaming Regulatory Act interacts with the National Labor Relations Act in this case is as follows. The basic interpretive framework, whether you take our position or the board's position, which is really just a narrower version of our position, is that when you're considering whether a federal statute applies to an Indian tribe as a tribe, you ask, are there inherent sovereign interests at stake? Are those the tribal activities in play? Would application of the federal law interfere with those tribal activities? And if so, is there some clear expression of congressional intent to reflect the congressmen to reach them? What IGRA does is, it seems to us, confirm once and for all that there is a tribal interest at stake of sufficient magnitude to trigger the clear expression requirement. That's what we think the role of IGRA is. If the tribe went into the business of manufacturing cars, you would say that the National Labor Relations Act does not apply for the same reasons? I would say that. I think this is a stronger case for us, as I've said before, because there's no federal statute that comprehensively regulates automobile manufacturing on tribal property. What would you say is a commercial situation that a tribe could conceive of and go in business for that you would say is not tribal sovereignty? Well, for many years, for nearly 30 years, the board itself drew a distinction between on-reservation and off-reservation activities. I'm not going to endorse that. It's certainly a plausible distinction. There are complications, I think, but as a general proposition, there is certainly some language in Supreme Court decisions on tribal sovereignty that suggests that there is a lesser sovereign interest in activities that take place off tribal property. But, of course, that's not something the court has to consider here. The Federal Gaming Act exists, but there's no functional difference between the operation of this casino and its use to fund the operation of the tribe and the operation of any other commercial enterprise by a tribe that funds the operation of the tribe. Correct? I think you might be able to reach the same conclusion in a case where some other revenue-generating activity on tribal land was at issue. Well, I mean, it doesn't matter whether it's cars or gas stations or, you know, if the tribe is doing it to make money, it helps support the functioning of the tribe. That's an important part of the case, but I think it's at least as an important part of the case that you have congressional findings explicitly tying Indian gaming to tribal self-sufficiency, self-reliance, self-determination, and self-government. But congressional recognition didn't make it more... Probably the casinos may well be vital in the sense that they're successful, but theoretically any other successful commercial activity has that same potential. Congress has just chosen not to regulate it or to... I would agree with that, and as I've said, I think the key role that IGRA plays in this case is that whatever debates one is engaged in about whether the tribal activity here is sufficiently sovereign to trigger the clear expression requirement, that debate has been resolved by Congress. Congress has made clear that this is at the very core of tribal sovereignty. It seems to us that before... It seems a little odd that operating a casino would be at the core of the government functions of the tribe, but whether that's odd or not, isn't the answer, as you were just giving, that there's no express indication in the NLRA that it applies to Indian tribes? So it has to be implicit or implied where we get ourselves into trouble in all sorts of different areas, and when we're assessing whether it was implied, it has to be undertaken in the context of the Indian Gaming Act, which specifically says this is part of the sovereign activities of a tribe. There isn't any corresponding statute that deals with the hypothetical automobile plant on Indian lands or the sawmill on Indian lands as addressed in one of the circuits. There just isn't anything there that arguably, one way or the other, sheds light on what Congress impliedly meant, right? I've got nothing to add to that other than to say I agree with it completely. It just seems to me that before the National Labor Relations Act can be interpreted to allow a strike at the revenue-generating enterprise of a sovereign tribal government that would have the effect, could have the effect, of shutting down the government, it's not too much to ask that Congress speak clearly, and it's undisputed in this case that Congress has not... in its trading and so on or not. Are there cases that say that an Indian tribe is exempt from the securities laws? I'm not sure whether there are any cases. I'm not sure what, if anything... You would argue that they are or are not. Well, I would say if you're talking about the tribe as a tribe as opposed to individual Indians who are, of course, subject to general laws the same way anyone else is, but you're talking about the tribe as a regulated entity, I don't know what the various securities laws say, if anything, about tribe, but I would say you apply the same analysis. Well, interestingly enough, while it might not be dealing with stock, there's a whole body of case law that's starting to evolve as to whether when tribes sign notes they can be foreclosed against or not, or whether that's protected by sovereignty and whether they've waived their sovereignty. There's a case out west that strikes fear in all of the casinos because it's suggested that the Indians weren't protected by sovereign immunity, and so that's an evolving part of the law right now. Nobody knows because the casinos fund all of these... The Indian tribes fund all these casinos by debt. And with the Court's indulgence, I mean, tribal immunity is a separate but related issue. On the subject of tribal immunity, the Supreme Court has made clear that there is no distinction between governmental and commercial functions and said that's for Congress to decide. That's exactly our position here. I know you were led down that path, but I think we're off track. Thank you both very much for your argument, and we'll consider the case carefully.